**STATE of Missouri, Plaintiff-Respondent,**

v.

**Michael Herbert SINGH, Defendant-Appellant.**

**No. 10788.**

Missouri Court of Appeals, Southern District, Division Two.

Aug. 2, 1979.

Motion for Rehearing or for Transfer Denied Aug. 23, 1979.

Application to Transfer Denied Oct. 10, 1979.

John D. Ashcroft, Atty. Gen., Steven Scott Clark, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Scott B. Tinsley, Springfield, for defendant-appellant.

MAUS, Judge.

The defendant was charged with the second degree murder of his wife Mary Ann Singh. After a four-day trial the jury returned a verdict of manslaughter, fixing his punishment at ten years' imprisonment. Defendant's motions for a new trial were overruled and he was sentenced accordingly. On appeal by his court-appointed attorney defendant asserts six points of error and by his pro se brief one additional point.

The decedent was first married at an early age and by this marriage had a son and a daughter. This marriage ended in divorce and was followed by a brief second marriage and several live-in male companions.

The defendant, 33 at the time of trial, was born in Trinidad, West Indies. He was of East Indian extraction. He had roughly the equivalent of a junior college education. In his native land he taught school. In 1970 he went to New York and for a time worked as a warehouseman. He then served in the army for three years and four months. After a brief period, he re-enlisted, but after one month went A.W.O.L. He came to Springfield. In the summer of 1976 he met the decedent and moved in with her and her two children. August 8 they were married. August 14 he was apprehended for being A.W.O.L. After being in custody a short period of time he was discharged and returned to the decedent's home.

That is when the marital difficulties began. Defendant ascribed these difficulties to financial problems and decedent's alleged sexual proclivities. They resulted in numerous, vociferous quarrels during which the decedent cursed and made derogatory remarks toward the defendant. She would hit and kick and throw things at the defendant. He said he usually tried to restrain her but admitted hitting her on occasions, the number of which he could not remember. In this connection decedent was five feet eight inches in height and weighed approximately 140 pounds. The defendant was five feet seven inches in height and weighed approximately 140 pounds. He had been an airborne ranger and received instructions in hand-to-hand combat.

September 15 the defendant left the state to see about collecting some money due him. After being unsuccessful and hitchhiking back he arrived at the decedent's home at about 5:00 a. m. on September 23. An altercation developed which led to the death of his wife.

The defendant's version was that when he told the decedent he couldn't stay unless she changed, she became violent and he tried to restrain her. She went to a closet and got a small .22 caliber revolver which he immediately took from her. He put the gun and a bag of bullets from the closet in his coat pocket. At this point he heard the daughter coming downstairs; the decedent backed away and said "don't kill me". She then told him she had filed for divorce (she had consulted an attorney) and that she had had an abortion (records indicated she had done so two days prior). At his reply, "God have mercy on your soul" she flared up, threatened him and started searching around the kitchen. She then went to the back porch and picked up a stick of wood. He followed. She rushed at him and tried to hit him. A struggle ensued moving off the porch to the yard. She taunted him about the abortion and his race. She succeeded in hitting him twice. She still had the stick when they reached a place by the side of the house.

Defendant then says decedent kept the struggle going and "then she pushed her hand in my pocket;" he thought she was going for the gun so he put his hand in the pocket;

"[t]hen she grabbed ahold—I can't remember, let's see—can I think for a minute?—Her hand was holding—I couldn't tell whether it was in the pocket or outside the pocket, but her hand was on the gun, she was trying to push her hand inside the pocket, that's right, and both of her hands were in there and she was trying to get it away and trying to strike me with this thing there and she hit me real hard and this really, you know, with all the pain and suffering and then hitch-

hiking [sic] and tiredness, sleepless, and all these things, it really shook me up, and in the struggle and everything the gun did go off."

He did not know the number of times the gun fired. Decedent was lying on the ground and the daughter was standing there. He did not know the decedent was shot and wondered why she was lying there. His throat burned and he went into the house, got a drink of water, got the keys and left in decedent's car.

The state presented the daughter whose testimony is summarized. She was awakened by the quarrel. She went downstairs and her mother was trying to hit the defendant who was holding her. Her mother said "[p]lease don't kill me" and Michael said "shut up". She first said she saw the gun in defendant's hand inside the house, but later said it was outside. She and her mother went out the back door and got to the corner of the house when she "looked over and he already had shot her, and I looked over and she was lying down." She first stated the decedent tried to hit the defendant with a stick of wood that night, but later said it was before that night.

Police officers arrived at approximately 5:45 a. m. The decedent was removed to the hospital where she died. A thorough search of the area was made and no stick of wood was found, although there were sticks of wood stacked on the back porch. The decedent had four gunshot wounds: one to the left temple; one to the right cheek; one to the back approximately thirty centimeters below her shoulder joint and one to the left forearm approximately 17 centimeters above the wrist. There were powder burns around the wounds to the cheek and wrist. An autopsy was performed. The pathologist described the trajectory of the bullets that made the wounds.

In the pathologist's opinion the trajectory of the bullet that entered the back was consistent with someone being hit while falling down and of the bullet that entered the chin was consistent with the person being on the ground or the gun pointed up. The gun that made the powder burns was fired within two to three feet of the body. The immediate cause of death was the bullet that entered the back.

A forensic chemist testified the stains on the right pocket of the coat defendant was wearing were caused by the firing of a gun, probably twice, inside of the pocket. The defendant didn't know if the gun was poked through the pocket and fired.

The defendant was arrested driving near Houston, Missouri. At the time of his arrest he told the officer he was the man they wanted; he was driving his girl friend's car; and that he had no weapon. The .22 revolver that fired the fatal shots was found in a plastic bag, with some ammunition, under the car seat on the driver's side. Defendant had reloaded it with four shells because he was sleeping in the woods and it was very bushy and there "could have been snakes or anything".

The defendant denied bringing the gun from Colorado. He said somewhat cryptically "that's only the second time I used that pistol." He denied telling the decedent's aunt it was his gun. The aunt had testified he so stated and, without objection, that the decedent was scared to death of guns and wouldn't have one in the house. In rebuttal, for the purpose of showing decedent's state of mind, a neighbor testified that on Monday before she was killed on Thursday the decedent said she was afraid of defendant, she was afraid of guns and would not have any in the house, and she had heard the defendant had a gun.

■ The defendant first asserts the trial court erred in determining the daughter was a competent witness. She was approximately five years nine and one-half months of age at the time of the occurrence and approximately six years and eight months of age at the time of trial. By statute, § 491.060 RSMo, V.A.M.S., a child under 10 years is by a rebuttable presumption incompetent. The burden was upon the state to establish her competency. *Hildreth v. Key*, 341 S.W.2d 601 (Mo.App.1960).

There is no fixed age at which a child may be a competent witness. Competency

is to be measured by the standard hereafter set forth under the singular facts and circumstances of each case. *State v. Watson*, 536 S.W.2d 59 (Mo.App.1976). Children of an age comparable to that of the daughter have been determined to be competent in a variety of situations.[1]

■ The competency of a child offered as a witness is to be determined by the court. The established procedure is for this determination to be made upon a voir dire examination held outside the presence of the jury. *J.L.W. v. D.C.W.*, 519 S.W.2d 724 (Mo.App.1975).[2] Such was done in this case.

■ It is in connection with the voir dire examination the defendant in his pro se brief asserts that the trial court erred by conducting "extensive cross-examination" of the daughter aiding in establishing her competency. We do not agree. It is fundamental that a trial court must maintain complete fairness and impartiality. This does not mean, however, the trial judge was cast into "the position of the umpire of a game, whose duty it was to interfere only so far as needed to decide whether the rules of the game had been violated." III Wigmore, Evidence, § 784, p. 188 (Chadbourn rev. 1970). "One of the well-recognized powers of the judicial function is the right and duty of the trial judge to propound additional questions to witnesses in order to develop the truth more fully and to clarify the testimony given." *State v. Grant*, 394 S.W.2d 285, 287 (Mo.1965).[3]

■ The conduct of the voir dire examination is within the control of the trial court. *State v. Statler*, 331 S.W.2d 526 (Mo.1960). *J.L.W. v. D.C.W.*, supra. The trial court may conduct the examination, permitting subsequent questions by counsel or the trial court may permit the examination to be conducted by counsel, with such questions by the court as it determines proper. *State v. Young*, 477 S.W.2d 114 (Mo.1972). "The ultimate responsibility for determining the competency of a child to testify rests with the trial court who occupies the best position to judge the qualifications of the witnesses." *State v. Sanders*, 533 S.W.2d 632, 633 (Mo.App.1976). It is eminently proper that the trial court, within the bounds of fairness and impartiality, participate in such a voir dire examination.

■ In this case, the trial court permitted counsel to initially examine the daughter concerning her competency. When their extensive examinations were completed the court asked a total of thirteen questions. We have carefully examined those questions and find they were fair and impartial, designed to aid in arriving at the truth concerning the competency of the witness. No error was committed.

■ Turning to the merits of the daughter's competency, the standards for competency are well established.

"They are: (1) present understanding of or intelligence to understand, on instruction, an obligation to speak the truth; (2) mental capacity at the time of

1. A child four years seven months old was competent as a witness to an accident, *Hildreth v. Key*, 341 S.W.2d 601 (Mo.App.1960); a child of 6 concerning her rape, *State v. Parton*, 487 S.W.2d 523 (Mo.1972); 6 years 5 months concerning attempted rape, *State v. Groves*, 295 S.W.2d 169 (Mo.1956); 5 years concerning molestation, *State v. Watson*, 536 S.W.2d 59 (Mo.App.1976); 6 years concerning enticement, *State v. Tillett*, 233 S.W.2d 690 (Mo.1950); 5 years 6 months concerning an accident, *Burnam v. Chicago Great Western R. Co.*, 340 Mo. 25, 100 S.W.2d 858 (1936). Additional cases are collected in *Hildreth*, supra.

2. However, an examination before the jury was not reversible error where no objection was made and the point was not preserved in a motion for new trial. *State v. Obie*, 501 S.W.2d

513 (Mo.App.1973). For a case where a prosecutor for the apparent purpose of avoiding comment upon the failure of the victim's sister to testify called the child before the jury established she was 7 years of age and made no attempt to qualify her, see *State v. Tandy*, 401 S.W.2d 409 (Mo.1966).

3. For additional authorities see *State v. Cain*, 485 S.W.2d 60 (Mo.1972); *State v. Tate*, 468 S.W.2d 646 (Mo.1971); *State v. Farmer*, 536 S.W.2d 748 (Mo.App.1976); *State v. Clark*, 522 S.W.2d 332 (Mo.App.1975). For cases in which the trial court violated the principle of fairness and impartiality see, *State v. James*, 321 S.W.2d 698 (Mo.1959); *State v. Haddix*, 566 S.W.2d 266 (Mo.App.1978).

the occurrence in question truly to observe and to register such occurrence; (3) memory sufficient to retain an independent recollection of the observations made; and (4) capacity truly to translate into words the memory of such observation." *State v. Young,* 477 S.W.2d 114, 116 (Mo.1972); *State v. Watson,* supra, at 60.

In the voir dire examination it was established that the prosecutor and her father had talked with the daughter about the occurrence and her testimony. At their suggestion she practiced counting and the ABC's. During her examination she did state that she would not be able to remember all that she testified to without the help of the prosecutor and that in testifying she relied on her father. On the other hand, she also stated she hadn't forgotten the events and she would have been able to remember had she not talked with them. Her answers first referred to may indicate she had permissible help in refreshing her memory.[4] There is no basis for any intimation that she was told what to say. Nor is there any indication that she testified other than on the basis of her recollection as demonstrated by the following cross-examination:

"Q. If you said what somebody else told you to say, would that be telling the truth, because they told you that's what to say? A. You don't always have to say what they say. Q. You don't have to say what they say? A. Huh-uh. Q. Okay. A. It might not be the truth, what they say."

She clearly stated that she had an independent memory of the occurrence as demonstrated by the following:

"THE COURT: Okay. You told us earlier this morning that you remember that Michael and your mommy were fighting. THE WITNESS: Yeah. THE COURT: Do you actually remember that happening or do you just recall your daddy telling you that it did happen? THE WITNESS: I remember it happening. . . . THE COURT: You told us earlier this morning that your mother went outside. Do you remember telling us that? THE WITNESS: Yes. THE COURT: Did you tell us that because you heard your daddy say that's what happened or because you now remember that it did happen? THE WITNESS: I remember that it did happen."

■ Other factors favoring the competency of the daughter were before the trial court. In addition to her testimony upon the voir dire hearing and at the trial, her testimony at her deposition and upon an aborted trial given within six months of the occurrence was before the court. Her testimony on four separate interrogations was both forthright and unswerving.[5] Her testimony was consistent with facts otherwise established by the evidence. *State v. Young,* supra; *State v. Sigh,* 579 S.W.2d 657 (Mo.App.1979). The death of her mother was a shocking occurrence that will undoubtedly scar her memory forever. *State v. Parton,* 487 S.W.2d 523 (Mo.1972); *State v. Ball,* 529 S.W.2d 901 (Mo.App.1975). The time between the event and her testimony was relatively short.[6] From the record, this child appears to have been candid, alert and intelligent. However, this factor could better be determined and weighed with what is now her printed testimony by the trial court who had the benefit of personal observation. It is the opportunity of personal observation that is the basis for the time-honored maxim that "[t]he trial court's determination that the child is qualified to give testimony will be reversed only for a

4. *Tate,* supra, n. 3; *State v. Sanderson,* 528 S.W.2d 527 (Mo.App.1975). Compare *Petty v. Kansas City Public Service Co.,* 354 Mo. 823, 191 S.W.2d 653 (1945).

5. This court may and also has considered her testimony during the trial. *State v. Robertson,* 480 S.W.2d 845 (Mo.1972). Any inconsistencies which do not vitiate a child's testimony go to the question of credibility, rather than competency. *State v. Jones,* 558 S.W.2d 286 (Mo. App.1977); *State v. Sanders,* 533 S.W.2d 632 (Mo.App.1976) and *State v. Ball,* 529 S.W.2d 901 (Mo.App.1975).

6. For a comprehensive analysis of this important aspect see *Hildreth,* supra, n. 1.

clear abuse of discretion." *State v. Ball*, supra, at 904. Also *State v. Young*, supra, at 116. The trial court properly found the daughter a competent witness.

■ Defendant next asserts the trial court erred in admitting four photographs of the deceased showing her wounds. One was a small color picture and the others black and white. In each the decedent was appropriately draped. We have examined these exhibits and doubt they are inflammatory. Certainly their probative value outweighed any possibility of prejudice. They were admissible to refute the defendant's version of the incident. *State v. Jackson*, 499 S.W.2d 467 (Mo.1973); *State v. Ward*, 569 S.W.2d 341 (Mo.App.1978). They are not barred because they are cumulative to the testimonial descriptions of the wounds. *State v. Ray*, 554 S.W.2d 596 (Mo. App.1977). They better enable the jury to perceive the location of those wounds. *State v. Frazier*, 550 S.W.2d 590 (Mo.App. 1977). "The trial courts have a wide discretion in determining the admissibility of photographs." *State v. Jackson*, supra, at 472. In this instance the trial court did not abuse that discretion.

Defendant's third point of error is the admission in evidence, over an objection of hearsay, of declarations of the decedent. In rebuttal a neighbor was permitted to testify that on Monday before the tragedy on Thursday the decedent told him she was afraid of defendant, she was afraid of guns, she would not have any in the house, and she heard the defendant had a gun. This testimony was offered for the purpose of proving her state of mind and, before the testimony was given, a limiting instruction was given to the jury.

This point has received but little attention in Missouri. From a review of the cases in other jurisdictions, the preponderance of authority is that, subject to limitations, the declarations of the decedent in a homicide case will be admitted to prove the decedent's state of mind where that is relevant.[7] The subject has been thoroughly reviewed in *United States v. Brown*, 160 U.S.App.D.C. 190, 490 F.2d 758 (1973).[8]

Whether such declarations are admitted because their use for that purpose does not fall within the proscription of the hearsay rule or as an exception to that rule is not clearly defined. A distinction is often drawn between direct assertions of a state of mind (I am afraid of x) and statements which inferentially establish a state of mind (I won't go near x). The former is said to be hearsay and is admitted as an exception to the rule. The latter is said not to be hearsay and is thereby admissible.[9] This distinction seems to be based more on suspicion of reliability of a possibly self-serving declaration than upon any inherent difference between the two. But, whether the declarations in this case are admissible as an exception to the hearsay rule or outside the purview of that rule is a technical question we need not burden this opinion with answering.[10]

7. *People v. Schindler*, 273 Cal.App.2d 624, 78 Cal.Rptr. 633 (1969); *State v. Wauneka*, 560 P.2d 1377 (Utah 1977); *People v. White*, 401 Mich. 482, 257 N.W.2d 912 (1977); *Sallee v. State*, 544 P.2d 902 (Okl.Cr.1975); *State v. Goodrich*, 97 Idaho 472, 546 P.2d 1180 (1976); *State v. Radabaugh*, 93 Idaho 727, 471 P.2d 582 (1970); *State v. Patriarca*, 112 R.I. 14, 308 A.2d 300 (1973); *Alcala v. State*, Wyo., 487 P.2d 448, cert. den. 405 U.S. 997, 92 S.Ct. 1259, 31 L.Ed.2d 466, reh. den. 406 U.S. 911, 92 S.Ct. 1613, 31 L.Ed.2d 823 (1971); *State v. Duke*, 110 Ariz. 320, 518 P.2d 570 (1974); *Commonwealth v. Borodine*, 371 Mass. 1, 353 N.E.2d 649 (1976); *People v. Perry*, 22 Ill.App.3d 738, 318 N.E.2d 17 (1974); *Carnes v. Commonwealth*, 453 S.W.2d 595 (Ky.1970); *State v. Wright*, 12 Or.App. 73, 504 P.2d 1065 (1973); *State v.*

*Phipps*, 224 Kan. 158, 578 P.2d 709 (1978). Also see, *State v. McCauley*, 8 Or.App. 571, 494 P.2d 438 (1972); *State v. Bartolon*, 8 Or.App. 538, 495 P.2d 772 (1972).

8. Also see VI Wigmore, Evidence, § 1730, p. 148 (Chadbourn rev. 1976).

9. See VI Wigmore, Evidence, §§ 1714–1715, pp. 90–100, (Chadbourn rev. 1976); Weinstein's Evidence, § 801(d)(1)[01], p. 801–63.

10. "[T]he distinction is not very important." *United States v. Brown*, 160 U.S.App.D.C. 190, 195, 490 F.2d 758, 763 (1973). "Fortunately, a widely recognized exception to the hearsay rule admits declarations of a present state of mind or feelings, and the occasion to make such

■ Defendant relies upon *State v. Benson*, 346 Mo. 497, 142 S.W.2d 52 (1940). We do not view that case as contrary to the majority rule admitting such declarations. The essence of that decision was to recognize the rule of admissibility of an intent to do an act in the immediate future. But, the court found the declaration in question was a self-serving declaration of past events not providing a substantial inference of the declarant's intent. In *State v. Ilgenfritz*, 263 Mo. 615, 173 S.W. 1041 (1915), the court held the decedent's threats of suicide to be competent evidence. Evidence offered to show a relevant state of mind in other circumstances has been consistently admitted.[11] We believe the prevailing view referred to above to be sound.

■ Such declarations revealing a state of mind often contain recitals of circumstantial facts. They are not admissible to prove the truth of such recitals. But, under the rule of multiple admissibility such declarations may be properly admitted in evidence solely to establish that state of mind.[12] Certainly upon request, an instruction must be given limiting the probative value of such testimony to establishing the relevant state of mind.[13] Whether such an instruction must be given without request or may be given at a time other than when the testimony is admitted are questions we

need not and do not answer.[14] In this case, before admission the trial court gave a proper limiting instruction.

Some decisions admit such declarations containing a recital of circumstances without regard to a possible limitation based upon prejudice to the accused.[15] Others admit such testimony only after a determination that the need for and value of such testimony outweighs possible prejudice to the accused.[16] Under the latter approach, while many factors are involved, it has been said the "most important consideration may be whether the statement, if used by the jury for its improper purpose, is virtually dispositive of the case and extremely damaging to the position taken by . . . (the defendant)." *United States v. Brown*, supra, 160 U.S.App.D.C. at 196, 490 F.2d at 764. Another factor of importance is the nature of the defense. If the defense be self-defense, suicide or accidental death "the need for such statements overcomes *almost any possible* prejudice". *United States v. Brown*, supra, 160 U.S.App.D.C. at 199, 490 F.2d at 767 (emphasis added). Even if the necessity for such balancing is the rule in Missouri, and we need not and do not determine that it is, we hold that the relevancy of the declarations in question outweighed any possible prejudice to the defendant.

refined distinctions as to the foregoing is limited largely to the realm of theory." McCormick on Evidence, § 249, p. 591 (2nd ed. 1972).

11. *United States v. Biondo*, 483 F.2d 635 (8th Cir. 1973); *State v. Walker*, 484 S.W.2d 284 (Mo.1972); *Terminal R. R. Ass'n. of St. Louis v. Schmidt*, 349 Mo. 890, 163 S.W.2d 772 (1942); *State v. Blackburn*, 273 Mo. 469, 201 S.W.2d 96 (1918); *State v. Trotter*, 536 S.W.2d 877 (Mo. App.1976).

12. *Walker*, supra, n. 11; *State v. McDaris*, 463 S.W.2d 813 (Mo.1971); *State v. Hale*, 371 S.W.2d 249 (Mo.1963); *Grimm v. Gargis*, 303 S.W.2d 43, 74 A.L.R.2d 599 (Mo.1957); *State v. Gardner*, 558 S.W.2d 395 (Mo.App.1977); *Trotter*, supra, n. 11; *State v. Herington*, 520 S.W.2d 697 (Mo.App.1975).

13. *Brown*, supra, n. 10.

14. See *Brown*, supra, n. 10; *State v. Houston*, 263 S.W. 219 (Mo.1924); *McDaris*, supra, n. 12; *State v. Gordon*, 499 S.W.2d 512 (Mo.1972).

Said to be necessary without request in *Goodrich*, supra, n. 7; *Salle*, supra, n. 7. Omission of instruction not error where not requested in civil case. *Freeman v. Kansas City Power & Light Company*, 502 S.W.2d 277 (Mo.1973). Where a limiting instruction was given at the time of admission of a statement solely admissible for impeachment, it was not error not to give a subsequent similar written instruction. *State v. Yowell*, 513 S.W.2d 397 (Mo. banc 1974).

15. *Schindler*, supra, n. 7; *Sallee*, supra, n. 7; *Duke*, supra, n. 7.

16. "When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out. *Shepard v. United States*, 290 U.S. 96, 104, 54 S.Ct. 22, 26, 78 L.Ed.2d 196 (1933). Also see *White*, supra, n. 7 and *Goodrich*, supra, n. 7.

■ Of course, as a prerequisite to admission the state of mind to be established by such declarations must be relevant to the issues in the case. The factors which make the state of mind of an alleged victim of a homicide relevant are myriad. However, the courts have developed three rather well-defined categories in which the relevancy of such statements of fear is established. These include cases involving defenses of self-defense, suicide of the decedent, and accidental death. *United States v. Brown,* supra.

■ In this case the defendant by cross-examination and by his own testimony injected the issues of self-defense and accidental death.[17] "In such cases the deceased's statements of fear as to guns or of defendant himself (showing he would never go near defendant under any circumstances) are relevant in that they tend to rebut this defense." *United States v. Brown,* supra, 160 U.S.App.D.C. at 199, 490 F.2d at 767.[18] The declarations in this case were clearly relevant.

■ Defendant next claims the trial court erred in instructing the jury upon murder in the second degree for the reason the evidence was insufficient to support that submission. Since the defendant was not convicted of murder in the second degree it is established that he cannot complain of that instruction. *State v. Strong,* 339 S.W.2d 759 (Mo.1960); *State v. Foster,* 355 Mo. 577, 197 S.W.2d 313 (1946); *State v. Stoer,* 553 S.W.2d 484 (Mo.App.1977). Further, there was evidence from which the jury could have found the defendant followed his wife from the house; he intended to cause her serious bodily harm or death by shooting her four times, once in the back; and he did not do so in anger, fear or agitation provoked by his wife or in self-defense. The instruction on murder in the second degree was supported by the evidence. *State v. Boyd,* 498 S.W.2d 532 (Mo. 1973); *State v. Adams,* 497 S.W.2d 147 (Mo. 1973); *State v. Strong,* supra.

Defendant complains the trial court erred in denying his motion for a change of venue from Greene County. A change of venue is authorized if "the minds of the inhabitants of the county . . . are so prejudiced against the defendant that a fair trial cannot be had therein." V.A.M.R.Crim.Rule 30.01. In his motion defendant alleged such prejudice existed because of extensive news coverage, emphasizing newspaper articles.

■ In a county such as Greene County when this issue is properly raised it is an issue of fact to be "proved to the satisfaction of the court" upon a hearing, unless the existence of grounds be within the knowledge of the court when removal may be ordered without a hearing. V.A.M.R. Crim.Rule 30.04. When a hearing is held, "the granting of a change of venue is a matter within the discretion of the trial court and its ruling is not to be disturbed on appeal unless an abuse of discretion is demonstrated." *State v. Zinn,* 562 S.W.2d 784, 788 (Mo.App.1978).

■ In this case the defendant offered copies of eight newspaper articles, established the extensive circulation of the newspaper and showed there had been radio and television news coverage. Two witnesses called by the defendant stated their opinion that because of this coverage he could not have a fair trial in Greene County. Defendant also so testified. Emphasis was placed upon the sensational aspects of the case resulting from the race and background of the defendant, the involvement of the child and defendant's previous courtroom behavior. The state countered with four witnesses, three of whom had no knowledge of the matter and one who had read the first articles but did not really remember any details and could not be prejudiced. The trial court concluded that an impartial jury could be selected and denied the motion. The determination of the trial

---

17. In his brief defendant referring to this evidence states: "It went to the heart of the defense, which was based upon the theory of self-defense."

18. Also see *Schindler,* supra, n. 7; *People v. Atchley,* 53 Cal.2d 160, 346 P.2d 764 (1959), cert. dismissed 366 U.S. 207, 81 S.Ct. 1051, 6 L.Ed.2d 233 (1961).

court was confirmed by the fact that the voir dire examination of the jury panel revealed only six who recalled any coverage. Three stated they had formed an opinion and were promptly excused. The defendant has not demonstrated the trial court's determination was erroneous and this point is denied. *State v. Londe*, 345 Mo. 185, 132 S.W.2d 501 (1939); *State v. Parcel*, 546 S.W.2d 571 (Mo.App.1977).

■ The defendant complains the trial court erred in not sustaining his second request for a change of judge. His complaint is based on two contentions. He first suggests that V.A.M.R.Crim.Rule 30.16, by stating "in the event the judge . . . to which said case has been transferred is also disqualified under the provisions of Rule 30.12, another judge of said court shall be assigned to the trial of said case . .", implies that a defendant is entitled to two disqualifications as a matter of right. We do not agree. V.A.M.R.Crim.Rule 30.12 states only one disqualification may be filed by a defendant. Read together the rules provide that a defendant may have only one disqualification as a matter of right. *State v. Holt*, 465 S.W.2d 602 (Mo.1971).

■ Of course, if a successor judge is in fact "interested or prejudiced", V.A.M.R. Crim.Rule 30.12, it is his duty to disqualify himself. But, a "successor judge is under a duty to remain as judge in the cause, and this duty is equally as strong as his duty to recuse himself under circumstances requiring it." *State v. Hindman*, 543 S.W.2d 278, 283 (Mo.App.1976). It was no doubt this duty, rather than his personal preference, that impelled the successor judge in this case to continue with this difficult case.

■ The defendant seeks to establish the trial court's prejudice in fact by citing the court's alleged tolerance of physical abuse of the defendant at the time of a mistrial. The record of the occurrence at the mistrial is sketchy. However, we can clearly glean from the record that the physical restraint of defendant resulted from his own improper conduct in the courtroom. Defendant also similarly cites an incident

that occurred upon trial counsel's request that, to assist him, a female lay assistant be permitted to be seated at the counsel table, assuming the defendant would sit between them. The trial court observed this might convey to the jury an impression the defendant was not likely to harm a female and the assistant could be of more help if seated on counsel's side. Trial counsel accepted this arrangement without objection. This action was within the sound discretion of the trial court.

After granting defendant a hearing upon his request for a second disqualification, the trial court's comments included the following: "I stand ready to give him a fair trial". Our careful review of the record reveals he did just that. The judgment is affirmed.

BILLINGS, P. J., HOGAN, J., and KELSO, Special Judge, concur.